ADAM RICHARDS LLC
Adam Richards (AR-2489)
40 Fulton Street, 7th Floor
New York, New York 10038
Telephone: (212) 233-4400
adam@arichardslaw.com

Attorneys for Plaintiff Keith Murray

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEITH MURRAY,<br><br>                              Plaintiff,<br><br>      - against -<br><br>UNITED PARCEL SERVICE OF AMERICA, INC.,<br>UNITED PARCEL SERVICE, INC., and UNITED<br>PARCEL SERVICE CO.,<br><br>                              Defendants. | **Index No. 08 CV 02160<br>(LAK)(DFE)**<br><br>**DECLARATION IN<br>OPPOSITION TO MOTION<br>SEEKING LEAVE TO AMEND<br>ANSWER** |
| UNITED PARCEL SERVICE, INC.,<br><br>                 Third-Party Plaintiff,<br><br>      - against -<br><br>JOSE BEATO,<br><br>                 Third-Party Defendant. | |

I, ADAM RICHARDS, declare as follows:

1. My office represents Plaintiff Keith Murray in the above-captioned action. I have personal knowledge of the facts and circumstances set forth herein.

2. Annexed hereto as Exhibit A is a letter dated July 7, 2008 from Richard J. Rabin, Esq., to the Court in this matter.

3. Annexed hereto as Exhibit B is a copy of an internal UPS Corporate Security Investigation Detail Report dated June 5, 2008 that was produced to Plaintiff by UPS in response to Plaintiff's First Request for the Production of Documents in this action.

4. Annexed hereto as Exhibit C is interview notes dated February 2, 2007 that were produced to Plaintiff by UPS in response to Plaintiff's First Request for the Production of Documents in this action.

5. Annexed hereto as Exhibit D is a written statement dated February 2, 2007 that was produced to Plaintiff by UPS in response to Plaintiff's First Request for the Production of Documents in this action.

6. Annexed hereto as Exhibit E is a certified copy of a transcript of a hearing dated July 27, 2007 before Administrative Law Judge Diane Dubiac, sitting for the New York State Unemployment Insurance Board. A copy of this document was produced to Plaintiff by UPS in response to Plaintiff's First Request for the Production of Documents in this action.

7. Annexed hereto as Exhibit F is a copy of on a Decision and Findings of Fact dated July 30, 2007 of Administrative Law Judge Diane Dubiac, sitting for the New York State Unemployment Insurance Board. A copy of this document was produced to Plaintiff by UPS in response to Plaintiff's First Request for the Production of Documents in this action.

8. Annexed hereto as Exhibit G is UPS' second request for the production of documents in this action.

9. I managed and oversaw Plaintiff's production of documents to UPS in this matter on or about June 19, 2008. Of the 108 pages of documents produced to UPS, virtually all

2

of them had either been produced to Plaintiff as part of the criminal case instituted against him by UPS or were documents that were already in UPS' possession.

I declare under the penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct and that this Declaration was executed in New York, New York on July 23, 2008.

Adam Richards

# EXHIBIT A

# AKIN GUMP
# STRAUSS HAUER & FELD LLP

—————— Attorneys at Law

**RICHARD J. RABIN**
212.872.1086/fax: 212.872.1000
rrabin@akingump.com

July 7, 2008

VIA HAND DELIVERY
Honorable Lewis A. Kaplan
United States District Court, SDNY
500 Pearl Street
New York, New York 10007

Re:  *Keith Murray v. United Parcel Service, Inc. et al Index No. 08-CV-02160(LAK)*

Dear Judge Kaplan:

This firm represents defendants (collectively, "UPS") in the above-referenced action. I write in response to Plaintiff's July 2, 2008 motion to compel disclosure.

*Background.* Plaintiff is a former UPS driver who resigned after being caught abusing his position of trust at UPS to steal cell phones from UPS vehicles. Despite his egregious breaches of his duty of loyalty, Plaintiff had the temerity to *sue UPS* alleging "false imprisonment" among other meritless claims with respect to his resignation and his subsequent arrest by the police. Later this week, UPS will be moving this Court for leave to amend its Answer to assert Counterclaims against Plaintiff for his egregious conduct.

*The Pending Motion.* Plaintiff's pending motion presents an issue of crucial importance to UPS: whether, and under what protections, the identity of a Confidential Informant who initially notified UPS of Plaintiff's suspicious conduct must be disclosed in discovery. Unmasking this Confidential Informant without sufficient protections would pose a direct and substantial threat to UPS's Loss Prevention efforts, including its Confidential Reward Program, through which UPS employees are encouraged to report any acts of dishonesty they witness under the assurance that "[a]ll information will be held in strict confidence." *See* Exh. 1.

*Plaintiff's Failure to Meet and Confer in Good Faith.* While this firm was familiar with Plaintiff's role in the improper cell phone scam at the time UPS's Initial Disclosures were filed, we did not initially realize those acts originally had been brought to light by a Confidential Informant who had approached the Company. We timely disclosed the existence of the Confidential Informant in supplemental disclosures and in UPS's Objections and Responses to Plaintiff's First Interrogatories which were served on the agreed due-date: June 18, 2008. *See* Exhs. 2 and 3. UPS made clear to Plaintiff that we would provide the identity of the Confidential Informant upon the entry of an appropriately tailored protective order. *See id.*

At first, Plaintiff suggested he was amenable to such an order, and indeed encouraged this firm to prepare one for his review. We promptly did so. *See* Exh. 4. Among the protections we sought were that (a) the Confidential Informant's identity not be revealed outside the scope of this action, (b) the Confidential Informant's identity not be revealed to personnel outside UPS's Security Department, and (c) the Confidential Informant be referred to as "Confidential

**AKIN GUMP**
**STRAUSS HAUER & FELD** LLP
━━━━ Attorneys at Law

Honorable Lewis A. Kaplan
July 7, 2008
Page 2

Informant" (rather than by his or her name) during depositions in this matter. UPS made clear that with these limited protections, it would provide the name of the Confidential Informant, make this individual available for a deposition, and permit Plaintiff to depose UPS's Security Personnel about their interactions with this individual. *See id.*

Plaintiff voiced certain concerns with the protective order as drafted. We thus suggested changes to accommodate his concerns, including allowing Plaintiff to use Confidential Informant's name in depositions (so long as Plaintiff did not reveal the individual's role as a Confidential Informant). Plaintiff appeared to agree with this concept, and we thus prepared a revised tailored protective order for his review. *See* Exh. 5. Upon review of the revised order, however, Plaintiff promptly rejected it. *See* Exh. 6.

Despite Plaintiff's unexpected reversal of position, we continued to try to resolve this matter amicably, inquiring if there were *any* "protections that you can/will agree to" to move this matter forward. *See* Exh. 7. Plaintiff flatly rejected this overture, claiming it was "not [his] obligation to come up with appropriate guidelines here" and that "[a]nything less than" the ability to "disclose this person's name in any fashion" under the existing general confidentiality order would be unacceptable. *See* Exh. 8. In other words, all of our efforts in negotiating, preparing, and modifying the tailored protective order – at Plaintiff's urging – were in fact a waste of time, as Plaintiff was not prepared to reach a compromise on this issue.

***This Court Should Deny Plaintiff's Motion and Issue a Carefully Tailored Protective Order.*** Plaintiff's motion to compel should be denied. Instead, this Court should utilize its broad authority to fashion protective orders under Fed. R. Civ. P. 26(c) to issue the carefully tailored protective order UPS has proposed. *See* Exh. 5. This order would provide Plaintiff and his counsel with the identity of the Confidential Informant, permit Plaintiff to depose the Confidential Informant, and permit Plaintiff to depose UPS personnel about the Confidential Informant (utilizing the Informant's name) so long as Plaintiff did not reveal the individual's role as a Confidential Informant. Such an approach would permit the Plaintiff to obtain appropriate discovery, while also not unduly undermining UPS's Confidential Reward Program or its broader Loss Prevention efforts.

We are available to address this matter more fully at the Court's convenience.

Respectfully Submitted,

Richard J. Rabin

Encl.

cc:    Adam Richards, Esq. (via Overnight Delivery w/ encl.)

# EXHIBIT B



**Corporate Security**

Investigation Detail Report

Print Date:    05 Jun 2008

| Name: | Keith Murray Termination | Status: | Closed |
|---|---|---|---|
| Number: | 07-NYC-0449 | System Date: | 04 Sep 2007 |
| Investigator: | Tom Cleary | Age in Days: | 275 |
| Created By: | Tom Cleary | | |
| Creation Notes: | (None) | | |
| Status Comments: | (None) | | |

| Associated Incidents: | 1 |
|---|---|
| Property Seizures: | 0 |
| Disciplinary Actions: | 1 |
| Grievance Records: | 1 |
| Prosecutive Actions: | 1 |
| Law Enforcement Contacts: | 0 |
| Observers: | 0 |
| Comment Records: | 1 |

| | Records | Costs | Recoveries |
|---|---|---|---|
| Total Package Losses: | 0 | $0.00 | $0.00 |
| Total Property Losses: | 0 | $0.00 | $0.00 |
| Total Frauds: | 0 | $0.00 | $0.00 |
| Total Investigative Costs: | 0 | $0.00 | N/A |
| Total Sources/Rewards: | 0 | $0.00 | N/A |
| Grand Totals: | 0 | $0.00 | $0.00 |

Summary:    (None)

The information contained in this report includes proprietary and confidential information that may be subject to attorney client privilege and is intended only for the use of authorized personnel. Unauthorized use, dissemination, distribution, or copying of this information is strictly prohibited.

CONFIDENTIAL

UPS0001053

# Incident

| | | | |
|---|---|---|---|
| **Incident Date:** | 02 Feb 2007 | **Incident Time:** | 14:00 |
| **System Date:** | 04 Sep 2007 | **SLIC:** | 1021 - MANHATTAN NORTH-NO. |
| **Creator:** | Tom Cleary | **Location:** | on road |
| **Recommended Investigator:** | Tom Cleary | **Status:** | Closed - 07-NYC-0449 |
| **Incident Type:** | Package Theft | **Value (USD):** | $5,910.00 |
| **Local Value:** | 5,910.00 | **Currency Type:** | US Dollar |

| | | | |
|---|---|---|---|
| **Reported By:** | Tom Cleary | **Title:** | Security Supervisor |
| | | **Phone:** | 5-220-6168 |

**Description:**
1021 Service Provider Keith Murray was arrested for his involvement in the delivery of fraudulently ordered cell phones. on 12-29-06, 1-5-07 and 2-2-07, Murray was observed releasing a total of 11 phones to an individual later identified as Jose Beato. Beato was observed on 2-2-07 passing cell phones over the counter at G&P Cellular, located at 2440 Amsterdam Ave, New York, Ny. Murray, Beato and the proprietor of the store were all arrested.

# Subject - KEITH MURRAY

| | | | |
|---|---|---|---|
| **Type:** | UPS - Hourly | **Employee ID:** | 1852702 |
| **Address:** | 2116 Crotona PKWY #3D Bronx, NY 10460 | **Telephone:** | 9177215497 |
| **Status:** | Full-Time | **Job Description:** | 02 Driver/Helper |
| **Operation Type:** | 02 Package | **Sort Type:** | 04 Days |
| **Job Type:** | Full-Time | **Employment Date:** | 15 Aug 2005 |
| **Union Type:** | Teamsters | **Job Date:** | 15 Aug 2005 |
| **Comments:** | (None) | | |

## Interviews

| | | | |
|---|---|---|---|
| **Interview Type:** | 04 Accusatory | **Interviewer:** | Tom Cleary |
| **Interview Date:** | 02 Feb 2007 | | |
| **Summary:** | Murray acknowledged bypassing standard UPS procedures in the delivery of cell phones over the last year to Jose. Murray chose to resign from UPS for personal reasons. | | |

The information contained in this report includes proprietary and confidential information that may be subject to attorney-client privilege and is intended only for the use of authorized personnel. Unauthorized use, dissemination, distribution, or copying of this information is strictly prohibited.

CONFIDENTIAL

## Disciplinary Actions

**Action Date:**    02 Feb 2007

**Action Type:**    Resigned      **Offense Type:**    Package Theft

**Discipline Comments:**    Resigned for personal reasons, signed statement and seperation form obtained from Murray.

**Grievance Date:**    23 Feb 2007

**Grievance Comments:**    Murray claims that he was tricked into signing the union waiver of representation, the statement form and the seperation form. Labor manager Tom Schultz upheld the discharge / resignation and the union filed for arbitration.

## Prosecutive Actions

**Action Date:**    02 Feb 2007

**Arresting Officer:**    (None)      **Case Number:**    (None)

**Complainant:**    Det. Figueroa      **Council Consulted:**    (None)

**Charges:**    Grand Larceny

**Arrest Comments:**    (None)

**Result Date:**    21 Aug 2007      **Result:**    Dropped

**Sentencing Comments:**    Criminal Charges dropped as per Manhattan ADA James Schiff. Unable to prove that Murray had knowledge of criminal acquisition of the items.

# Comments

**Comment Date:**    04 Sep 2007

**Comment Type:**    Investigator Note      **Submitted By:**    Tom Cleary

**Comment:**    pending arbitration as of 9-4-07

# Investigation Appraisal

**Date Closed:**    02 Oct 2007      **Result:**    Positive

**Closure Comments:**    see file

**Critique:**    (None)

**Was CCTV equipment used in this Investigation?**

No

**What changes were made to prevent this type of incident from happening again, and who is responsible for the implementation and maintenance of these changes?**

na

**What did you learn through this investigation that will help you or others when investigating similar incidents in the future?**

na

The information contained in this report includes proprietary and confidential information that may be subject to attorney client privilege and is intended only for the use of authorized personnel. Unauthorized use, dissemination, distribution, or copying of this information is strictly prohibited.

CONFIDENTIAL

UPS0001055

| | |
|---|---|
| **Timeliness:** | N/A |
| **Completeness:** | N/A |
| **Resolution:** | N/A |
| **Professionalism:** | N/A |
| **Total:** | N/A |
| **Overall:** | N/A |

The information contained in this report includes proprietary and confidential information that may be subject to attorney client privilege and is intended only for the use of authorized personnel. Unauthorized use, dissemination, distribution, or copying of this information is strictly prohibited.

CONFIDENTIAL

UPS0001056

# EXHIBIT C

no shop steward present
Tom Cleary, Julian Media

2/2/07            1:30 pm.

- Cleary introduced himself & myself to driver.
- Explained that this is an official discussion.
- Explained his right to have a shop steward present
  and was questioned as to whether or not he wants a
  shop steward present. Mr murray was willing to
  speak without a shop steward. He signed waiver.
  Was told that he can at anytime stop and request
  his shop steward.

- Informed Mr Murray about investigation regarding
  deliveries made on his route. He was shown a
  picture of suspect, who begins phone, whom he identified as Jose.
  He explained that Jose shows him ID and list of
  tracky #s on his route and he give him the
  packages listed. Mr Murray says Jose's address is
  #601 W 190th St Apt #52 or #54"n". from hsp. recollection Mr murray is
  unsure of Jose's last name, he gave possible names
  Baniao    Beonas - or Baez.

- Murray was again informed of the penalties & the discussion
  and the need for him to speak the truth during the
  discussion.

CONFIDENTIAL
UPS 000040

- Jose signs the board when he gets the packages.
- Mr murry gave Jose 5 pkg with 5 different address
- All murray

M. M. - Mr Murray.

- Mr. Murry states the he does not receive any money for the pkgs except ~~&~~ occasional tips of $5- or $10. He says he gets tips from many customers.

- Mr Murray was asked what are delivery procedures. He states that as long as someone has a listy tracking #'s that ~~the~~ thinks it is ok to give them to the person. Else if that person approached them on street and is name is not noted on the boxes. Say Ralph Carter from centre, long time ago told him that their procedures were ok based on a similar situation in the past that stated.

- Mr Murray ~~acknowledge~~ acknowledged that he should verify that the ID's match the ~~boxs~~ name on the box(es) that he is delivery.

- He was shown pictures of ~~suspect~~ suspect and perfum & a bag of cellphones that he got from M.M.

- Say he did not ~~receive~~ any money for pieces ~~today~~ he gave to Jose today. He claims he does not get anything for them. He just delivers them. He delivered 6 pkgs today 2/2/07.

- M.M. Stats that Jose sometimes calls him on his cellphn and gives him a listy of the tracking #'s he is looking for. Say he bought his personal phone at the same stop on his route. He lives on the Bronx.

  646 796 578 - Jose ~~cell~~ cell phone # in m.m. cell phone from incoming call made to Jose today 2/2/07

(left margin notes, written vertically)
- gave delivery tips?
- what is delivery practice?
- did not give list?
- did not get money does?
- how was cont. told?

CONFIDENTIAL
UPS 000041

• Cleary, there are 11 persons that have been delivered to JSI. The value of the first 5 was $2400. Today 4th the 1st 5 is approx $5000.00 or more. You have the opportunity to help yourself by telling the truth. We have enough to fire you or lock you up.

nm: I am not involved in any fraudulent activities. I am telling everything I know. I am sorry all you are asking for.

Cleary: You are involved because you delivered the pkgs on this settlement by bypassing our procedures.

(Cleary) MM was asked to put in writing his delivery procedure with this suspect.

Cleary: I saw you give him pkgs 2 Fridays in a row. and he came to your truck 2 times today.

CONFIDENTIAL
UPS 000042

# EXHIBIT D

REDACTED

Statement of _Keith L. Murray_

Social Security Number

Date _2, 2, 07_

Time _____

Page ____ of ____

Address _2116 Crotona Pkwy_

_Bronx NY 10460_

Phone _917-221-5497_

Work Area _____

I, _Keith Murray_____, voluntarily make the following

statement to _____, knowing that no threats or

promises have been made to me.

Today Jose came up to me after calling me to tell me tracking numbers of items he ordered. The reason why these packages was given to customer was because he tells me tracking # for packages; I went in side truck got boxes, he came to the truck & signed for each one, at the truck; I didn't get any money from him for anything as we are in anything together. This isn't the first time of him getting packages from me, because he was a supers helper on 188 St. I've gotten to trust him, because I was told by Management to get to know the supers, there helpers & people.

Writer's Initials _____

CONFIDENTIAL
UPS 000009

Page ____ of ____

to leave packages with to keep send agains
numbers down. So yes I can say I've
made a mistake do to ~~teaching that~~
no problem comeing up in the pass I
would scan + let him sign for packages
not because we are in this together.
This has been happening from when
I started doing this route, for
about a year he would come up to
truck, 2 maybe 3 times a week, I would
deliver packages to him mostly cell phones
not do to any deal we have together.
til I realized that his I.D. hadn't
match the packages he got from me, that
a mistake I've made do to trustn customer.

I have had this statement consisting of  2  page(s), each of which I have initialed, read
to me and I have read myself. I agree to the truth and accuracy of the facts contained in
the statement.
This statement was completed at __3:10p__ m, on the __2__ day of __Feb__, __2007__.
                                            (time)           (day)           (month)     (year)

_Keith L. Murray_
Signature of person giving voluntary statement

_JD_
Witness

                                         2,2,07
                                         Date                   Time

Writer's Initials KM

CONFIDENTIAL
UPS 000010

# EXHIBIT E

NEW YORK STATE DEPARTMENT OF LABOR

UNEMPLOYMENT INSURANCE

ADMINISTRATIVE LAW JUDGE SECTION

In the Matter of the Liability for
Unemployment Insurance Contributions
under Article 18 of the Labor Law of:

Keith L. Murray
Employer - Appellant

Employer - United Parcel Service Inc.

M. Patricia Smith,
Commissioner of Labor

Case No:  007-13959
Appeal Board No.: 538646

Date of Hearing:         July 27th 2007

Place of Hearing:        New York

Before:                  Diane L. Dubiac
                         Administrative Law Judge

Transcribed by:          Cinzia Lister

Appearances

        Clt:             Keith L. Murray
        Emp:             United Parcel Service Inc.
        Emp Rep:         Tom Cleary, Security Rep.


CERTFIED TO BE A TRUE AND ACCURATE COPY

RECEIVED
U.I. APPEAL BOARD
TROY, NY

Ryan Myers
ACCESS OFFICER    SEP 0 4 2007

Murray - Testimony

ALJ DUBIAC:  This is a hearing in the case of Keith Murray.  00713959.  The hearing is in New York City on July 27th, 2007.  It was scheduled for 2:30.  It's now 2:26.  Present is the claimant and your name sir?

MR. CLEARY:  Tom Cleary.  C-L-E-A-R-Y.

ALJ DUBIAC:  And what's your title?

MR. CLEARY:  Security representative.

ALJ DUBIAC:  My name is Diane Dubiac. I'm the administrative law judge assigned to this hearing.  I am independent and impartial.  I have no connection to the branch of the department of labor that issued the initial determination which held the claimant eligible to receive benefits.  I'd like to refer to that determination first identified as (inaudible) benefits reason. The claimant resigned in lieu of termination following an investigation of alleged wrongdoing.  He has been arrested and charged with a felony but he has not been convicted. You have not provided any evidence of deliberate wrongdoing on his part.  The employer requested a hearing and objected

Murray - Testimony

contending that the claimant lost his

employment due to misconduct so the issue is

whether or not the claimant did lose his

employment by reason of misconduct. The

hearing will proceed as follows: I will take

the testimony of the parties and witnesses

under oath or affirmation. After each party

or witness testifies, I will offer the

opposing party an opportunity to cross

examine by asking questions. All parties may

present witnesses and records or ask that

they be subpoenaed and at the end of the

testimony, each of the parties can make a

closing statement. No decision will be made

by me in person here today. My written

decision will be mailed to each of the

parties within 10 days. I'm going to start

the hearing with the employer's testimony

followed by cross examination. Then I'm

going to take the claimant's testimony

followed by cross examination. All right.

Mr. Murray, do you understand what I've

explained?

    MR. MURRAY:  Yes.

Murray – Testimony

1
2          ALJ DUBIAC:  Are you ready to proceed
3      with the hearing?
4          MR. MURRAY:  Yes.
5          ALJ DUBIAC:  Mr. Cleary, do you
6      understand?
7          MR. CLEARY:  Yes.
8          ALJ DUBIAC:  Are you ready to proceed?
9          MR. CLEARY:  Yes.
10         ALJ DUBIAC:  Would you raise your right
11     hand?  Do you swear or affirm to tell the
12     truth?
13         MR. CLEARY:  Yes.
14         ALJ DUBIAC:  Okay.  Put your hand down.
15      Would you state your name and your title for
16     the record once more?
17         MR. CLEARY:  Tom Cleary.  Security
18     representative.
19         ALJ DUBIAC:  Okay.  And this is United
20     Parcel Service?  Would you say it's a
21     transportation company?
22         MR. CLEARY:  Yeah.
23         ALJ DUBIAC:  Okay.  What position did
24     the claimant hold?
25         MR. CLEARY:  Service provider.  Delivery

1    Murray - Testimony

2        driver.

3            ALJ DUBIAC:  And about how long did he

4    work for your company?

5            MR. CLEARY:  Uh, give me a minute.  I

6    don't recall.

7            ALJ DUBIAC:  Mm hm.

8            MR. CLEARY:  A vicinity of two years.

9            ALJ DUBIAC:  2 did you say?  About 2?

10            MR. CLEARY:  I believe so.

11            ALJ DUBIAC:  Okay.  What's the last day

12    that he worked?

13            MR. CLEARY:  February 2nd

14            ALJ DUBIAC:  '07?

15            MR. CLEARY:  Yes ma'am.

16            ALJ DUBIAC:  Was it full time or part

17    time?

18            MR. CLEARY:  Full time.

19            ALJ DUBIAC:  Was he a member of a union?

20            MR. CLEARY:  Yes.

21            ALJ DUBIAC:  And about how much was he

22    paid at the time he stopped working there?

23            MR. CLEARY:  Uh, I don't know if he made

24    full pay yet.  Have you reached…

25            ALJ DUBIAC:  Okay.  You can't ask any

1    Murray - Testimony

2        questions of the claimant now.  You're on

3        your own for testifying at this point.

4             MR. CLEARY:  I don't know.

5             ALJ DUBIAC:  Okay.  Um, was he paid by

6        the hour?

7             MR. CLEARY:  Yes.

8             ALJ DUBIAC:  Did he quit or was he

9        discharged?

10             MR. CLEARY:  He resigned for personal

11        reasons.

12             ALJ DUBIAC:  On what day did he resign?

13             MR. CLEARY:  February 2nd.

14             ALJ DUBIAC:  '07.  Correct?

15             MR. CLEARY:  Correct.

16             ALJ DUBIAC:  All right.  Did he give any

17        notice that he'd be leaving on that day?

18             MR. CLEARY:  No.

19             ALJ DUBIAC:  Did he tell anybody on that

20        day that he was resigning?

21             MR. CLEARY:  Yes.

22             ALJ DUBIAC:  And did he give a written

23        resignation?

24             MR. CLEARY:  Yes.

25             ALJ DUBIAC:  Do you have a copy of that

Murray - Testimony

1    written resignation?

2        MR. CLEARY:  Yes.  I do.

3        ALJ DUBIAC:  Let me see it.

4        MR. CLEARY:  (inaudible).  I'm sorry.

5        ALJ DUBIAC:  Thank you.  Okay.  This is

6    the resignation.  It's a separation form.

7    It's dated 2/2/07.  Okay.  Is this signed by

8    the claimant as far as you know?

9        MR. CLEARY:  Yes.

10       ALJ DUBIAC:  Any objection or comment to

11   its receipt into evidence?

12      MR. CLEARY:  No.

13      ALJ DUBIAC:  Okay.  I'm showing it to

14   the claimant.  Any objection or comment to

15   its receipt into evidence?

16      MR. MURRAY:  No.

17      ALJ DUBIAC:  I have a document.  It's

18   dated February 2nd '07.  It's a one page

19   separation form.  It's marked exhibit 1.

20   It's received into evidence.  Was continuing

21   work available for the claimant if he had not

22   resigned?

23      MR. CLEARY:  Yes.

24      ALJ DUBIAC:  He could have stayed

1    Murray - Testimony

2        working there?

3            MR. CLEARY:  Oh, no.  That's, he would

4        have been discharged.

5            ALJ DUBIAC:  So the answer is no?

6            MR. CLEARY:  No.

7            ALJ DUBIAC:  Okay.  Why not?

8            MR. CLEARY:  Because of his involvement

9        in a scheme to obtain and deliver (inaudible)

10       ordered cell phones.

11           ALJ DUBIAC:  A scheme to uh, what was

12       the first word?  Obtain?

13           MR. CLEARY:  Obtain.

14           ALJ DUBIAC:  And sell?

15           MR. CLEARY:  Deliver.

16           ALJ DUBIAC:  And deliver per sale?

17       Deliver per sale?  Is that what you said?

18           MR. CLEARY:  Um...

19           ALJ DUBIAC:  Just repeat what you said.

20       His participation in a scheme.

21           MR. CLEARY:  To obtain and deliver

22       fraudulently ordered cell phones.

23           ALJ DUBIAC:  Okay.  So did the claimant,

24       was the claimant given the choice of

25       resigning instead of being discharged?

Murray - Testimony

1

2          MR. CLEARY:  Yes.

3          ALJ DUBIAC:  Okay.  And when was this

4      that he was given that choice?

5          MR. CLEARY:  February 2nd.

6          ALJ DUBIAC:  Did you give him the choice

7      yourself?

8          MR. CLEARY:  Yes.  I did.

9          ALJ DUBIAC:  Okay.  And um was he going

10     to be discharged right then and there if he

11     didn't resign?

12         MR. CLEARY:  Yes.

13         ALJ DUBIAC:  All right.

14         MR. CLEARY:  There is a follow up

15     hearing with the union though.

16         ALJ DUBIAC:  Okay.  Um, was it the

17     employer's intent to discharge him right

18     away?

19         MR. CLEARY:  Yes.

20         ALJ DUBIAC:  Okay.  And uh when is it

21     contended that this alleged scheme took

22     place?

23         MR. CLEARY:  Over the course of several

24     months, we have, we have evidence from three

25     specific days.

Murray - Testimony

1

2          ALJ DUBIAC:  No.  I just need, over the

3     course of several months?  The period?

4          MR. CLEARY:  Over the course, well, I'll

5     say from December through February.  December

6     of '06.

7          ALJ DUBIAC:  December '06.

8          MR. CLEARY:  Through February, the

9     beginning of February of '07.

10          ALJ DUBIAC:  February '07.  And what

11     leaves the employer to believe the claimant

12     did this?

13          MR. CLEARY:  There was a pattern of

14     deliveries with Sprint cell phones that

15     matches prior cases where people have been

16     approached on the road by people attempting

17     to uh fraudulently obtain cell phones and

18     the…

19          ALJ DUBIAC:  Wait a minute.  Say that

20     again.  There's a pattern.

21          MR. CLEARY:  His pattern of deliveries

22     indicates fraudulent deliveries.

23          ALJ DUBIAC:  His?  The claimant's?

24          MR. CLEARY:  Yes.

25          ALJ DUBIAC:  In what way do they

Murray - Testimony

1

2          indicate fraudulent deliveries?

3              MR. CLEARY:  There will be multiple

4          packages to different addresses all delivered

5          at the same time to one individual.

6              ALJ DUBIAC:  Multiple packages delivered

7          same time to one individual.  So why does

8          this indicate wrongdoing?

9              MR. CLEARY:  Because there are certain

10         delivery guidelines that our employees are

11         expected to follow.

12             ALJ DUBIAC:  Such as?

13             MR. CLEARY:  Such as we deliver to

14         addresses.  When somebody comes up to the

15         package car, we call them package cars, when

16         somebody comes up to the delivery vehicle in

17         the street looking for a package, they need

18         to supply identification that matches the box

19         in order for the box to be released to that

20         person.

21             ALJ DUBIAC:  Yeah.  So what does that

22         have to do with anything?

23             MR. CLEARY:  There were 6 uh different

24         packages for 6 different addresses released

25         to one individual without obtaining proper

Murray - Testimony

1     i.d. for each of the packages.

2          ALJ DUBIAC:  And what leads the employer

3     to believe that, that that happened?

4          MR. CLEARY:  It was observed on video

5     tape and matched up with his delivery

6     records.

7          ALJ DUBIAC:  Well, was the claimant seen

8     on video tape giving the packages to this

9     individual?

10         MR. CLEARY:  Yes.

11         ALJ DUBIAC:  He was?

12         MR. CLEARY:  Yes.

13         ALJ DUBIAC:  Did you see the tape?

14         MR. CLEARY:  Yes.

15         ALJ DUBIAC:  Do you have the tape with

16    you?

17         MR. CLEARY:  Yeah.  It's a DVD.

18         ALJ DUBIAC:  Um, you have a computer to

19    play it back on?

20         MR. CLEARY:  I do not.  You can have it

21    if you need it for your file or…

22         ALJ DUBIAC:  No.  I'm not going to take

23    it right now.  You don't have a laptop to

24    play it back on?

25

Murray - Testimony

1

2        MR. CLEARY:  No.

3        ALJ DUBIAC:  Okay.  Um, and what did you

4    see in the video?

5        MR. CLEARY:  I saw an individual that uh

6    we now know, his name is Jose I believe come

7    up to the package car on 3 separate occasions

8    video taped.

9        ALJ DUBIAC:  Wait.  To who's package

10    car?

11        MR. CLEARY:  To Keith Murray's.

12        ALJ DUBIAC:  Package car.  Okay.

13        MR. CLEARY:  In the vicinity of 188th

14    Street or 190th Street in Autoban Avenue in

15    upper Manhattan.

16        ALJ DUBIAC:  Mm hm.  Okay.  What

17    happened?

18        MR. CLEARY:  We observed this guy.  I

19    only know his name is Jose.

20        ALJ DUBIAC:  Mm hm.

21        MR. CLEARY:  Uh, we saw him leaving the

22    package car in the possession of uh packages

23    that appeared to be cell phone packages.

24        ALJ DUBIAC:  You could tell that from

25    the tape what was in the packages?

Murray - Testimony

1

2          MR. CLEARY:  Yeah.  They're distinctive

3     looking.  They're the size, I've been doing

4     this for 19 years.  They are distinctive

5     looking.  They have specific labels and tape.

6          ALJ DUBIAC:  They were what?  DVD's  Is

7     that what you said?  What were they?  I'm

8     sorry.

9          MR. CLEARY:  Cell phones.

10          ALJ DUBIAC:  Cell phones.  I'm sorry.

11          MR. CLEARY:  Cell phones.

12          ALJ DUBIAC:  Okay.  You're absolutely

13     certain there were cell phones in these

14     packages?

15          MR. CLEARY:  Yes.

16          ALJ DUBIAC:  Without a doubt?

17          MR. CLEARY:  Yes.

18          ALJ DUBIAC:  Could it have been anything

19     else?

20          MR. CLEARY:  No.

21          ALJ DUBIAC:  How can you make that

22     statement?

23          MR. CLEARY:  I verified that information

24     with Sprint security.

25          ALJ DUBIAC:  That what?

Murray - 7/27/07                    14

Murray – Testimony

1

2     MR. CLEARY:  That the content of the

3     boxes were cell phones.

4     ALJ DUBIAC:  How would they know what

5     was given to this individual?

6     MR. CLEARY:  The tracking number on the

7     package that Mr. Murray recorded is matched

8     up to a specific shipment.

9     ALJ DUBIAC:  So the tracking number the

10     claimant had on a sheet of some sort or…

11     MR. CLEARY:  Each package in our system

12     has a unique tracking number which…

13     ALJ DUBIAC:  Yeah but where is the

14     number?  Does the claimant have the number?

15     Is it in a computer?  Where is it?

16     MR. CLEARY:  The tracking number is on

17     the package label and he records it in his,

18     if you've seen the UPS driver, they carry

19     that little hand held computer.

20     ALJ DUBIAC:  Okay.

21     MR. CLEARY:  He scans the bar code on

22     the tracking label.

23     ALJ DUBIAC:  Okay.  So he scanned the

24     packages?

25     MR. CLEARY:  Correct.

1    Murray - Testimony

2              ALJ DUBIAC:  And it was checked with

3    Sprint that these were cell phones?

4              MR. CLEARY:  Correct.

5              ALJ DUBIAC:  Did you yourself check it?

6              MR. CLEARY:  Yes.

7              ALJ DUBIAC:  Okay.  So what was wrong

8    with him giving the packages to this person?

9              MR. CLEARY:  Uh, Sprint confirmed that

10   the packages were ordered under fraudulent

11   circumstances.

12             ALJ DUBIAC:  How would they know that?

13             MR. CLEARY:  The packages were insurance

14   replacement phones.  Uh, the account holders

15   were from all over the country with $50

16   charges that the account holders were charged

17   to ship the insurance replacement phone

18   (inaudible).  The charges were denied by the

19   account holders.  They called up and said I

20   never ordered a replacement phone.

21             ALJ DUBIAC:  Do you have any proof of

22   this?

23             MR. CLEARY:  Uh, no.  I don't.  I don't.

24             ALJ DUBIAC:  Is it just conversations

25   with Sprint?

Murray - Testimony

1

2          MR. CLEARY:  Yes.

3          ALJ DUBIAC:  Do you have anybody here to

4      testify from Sprint?

5          MR. CLEARY:  No.

6          ALJ DUBIAC:  Now, uh what leads the

7      employer to believe that the claimant knew of

8      this whole scheme?

9          MR. CLEARY:  We train our people to do a

10     job in a certain way and uh our employees are

11     trained to deliver to addresses and they're

12     not supposed to deliver federal packages to

13     one individual in the street to several

14     different addresses without you know, it's a

15     pattern of delivery (inaudible).

16         ALJ DUBIAC:  When you say different

17     addresses, you mean there were different

18     addresses on the packages?

19         MR. CLEARY:  Correct.

20         ALJ DUBIAC:  So he delivered packages to

21     one individual who was on the street and they

22     were addressed to different addresses?

23         MR. CLEARY:  Correct.

24         ALJ DUBIAC:  Okay.  Okay.  And was the

25     claimant confronted about this by anybody?

Murray - Testimony

1

2          MR. CLEARY:  The day he was arrested.

3          ALJ DUBIAC:  Did you yourself confront

4      him?

5          MR. CLEARY:  Yes.

6          ALJ DUBIAC:  And what did he say?

7          MR. CLEARY:  He claimed he was just

8      delivering the packages and he was trying to

9      do his job and that the individual…

10          ALJ DUBIAC:  So he denied wrongdoing?

11          MR. CLEARY:  Correct.

12          ALJ DUBIAC:  Okay.  What did he say

13      about giving the uh packages to this person

14      on the street?

15          MR. CLEARY:  He said that this gentleman

16      was a uh used to be a supers helper at some

17      point of some building in the general

18      vicinity.

19          ALJ DUBIAC:  Mm hm.

20          MR. CLEARY:  So he thought it was okay

21      to release these packages to him.  He

22      acknowledged that he…

23          ALJ DUBIAC:  Wait just a second.  So

24      you're saying because um he um released the

25      packages to this person without delivering

1    Murray - Testimony

2         them to the actual address, that um he should

3         have known or the employer is assuming that

4         he had knowledge of this fraudulent scheme?

5              MR. CLEARY:  Yes.

6              ALJ DUBIAC:  All right.  And did he say

7         uh how it was arranged that he was giving

8         these cell phones to this particular person?

9              MR. CLEARY:  He said that Jose would

10        contact him either with a list of names or

11        tracking numbers and let him know what he was

12        expecting or when he approached the vehicle,

13        he would say what he was looking for.

14             ALJ DUBIAC:  So what leads the employer

15        to believe that the claimant knew that this

16        was all part of a scheme?

17             MR. CLEARY:  Because that practice

18        bypasses uh approved standard operating

19        procedure.  It's not an acceptable delivery

20        procedure.

21             ALJ DUBIAC:  Mm hm.  Okay.  So you're

22        saying that means he was guilty?

23             MR. CLEARY:  And that coupled, and that

24        coupled…

25             ALJ DUBIAC:  Is that what you're saying.

Murray - Testimony

1    Wait.  I don't have an answer to the

2    question.  You're saying that implies that he

3    knew that there was something wrong going on?

4         MR. CLEARY:  Correct.

5         ALJ DUBIAC:  Okay.  All right.  Did the

6    employer ever observe any cash being

7    exchanged or any money being exchanged for

8    these phones?

9         MR. CLEARY:  Did not.  No.

10        ALJ DUBIAC:  Okay.  How many phones are

11   we talking about?

12        MR. CLEARY:  Uh, a total of 11.

13        ALJ DUBIAC:  11 altogether.

14        MR. CLEARY:  That we have proved.

15        ALJ DUBIAC:  The whole scheme was only

16   11.

17        MR. CLEARY:  Well, that we actually have

18   on video tape.  The scheme itself is dozens.

19   I don't have an exact number.

20        ALJ DUBIAC:  Okay.  So we're talking

21   dozens and on video tape, you observed 11?

22        MR. CLEARY:  Yes.

23        ALJ DUBIAC:  That you could tell from

24   looking at the video tape.  They're 11?

Murray - Testimony

1

2    MR. CLEARY:  Uh, we compared his

3    delivery records with the video tape and

4    determined that there were 11 packages.

5    ALJ DUBIAC:  Okay.  With tracking

6    numbers?  Is that how it was done?

7    MR. CLEARY:  Yes.

8    ALJ DUBIAC:  Well, didn't he have other

9    deliveries that day though?

10   MR. CLEARY:  Yes he did but each

11   tracking number is specific.  You can tell

12   from a tracking number what shipper it is.

13   The first couple of digits in the tracking

14   number identify what shipper it is.

15   ALJ DUBIAC:  Well, how would you know

16   from looking at the tape which ones were

17   given to this individual?

18   MR. CLEARY:  From looking at the tape.

19   ALJ DUBIAC:  How would that tell you?

20   MR. CLEARY:  The time on the video tape

21   versus the time on his records.

22   ALJ DUBIAC:  Okay.  So he put for the

23   tracking number…

24   MR. CLEARY:  And the (inaudible).

25   ALJ DUBIAC:  He put the time of the

Murray — Testimony

delivery?

    MR. CLEARY:  It's automatically recorded.

    ALJ DUBIAC:  Right.

    MR. CLEARY:  The time.

    ALJ DUBIAC:  Does he scan them you're saying?

    MR. CLEARY:  Yes.

    ALJ DUBIAC:  Because he scanned them? Okay.  And the time correlated to the video tape?

    MR. CLEARY:  Correct.

    ALJ DUBIAC:  Where was this video taken? How was it taken?  Was there a camera on the delivery truck?

    MR. CLEARY:  Covert Surveillance. Covert Surveillance.  A uh surveillance company that we hire for investigations.

    ALJ DUBIAC:  Oh, okay.  All right.  But the claimant admitted to you that he did give this individual the tapes?

    MR. CLEARY:  The packages.

    ALJ DUBIAC:  The packages.  I'm sorry.

    MR. CLEARY:  Yes.

Murray - Testimony

1

2          ALJ DUBIAC:  With the cell phones?

3          MR. CLEARY:  He didn't say they were, he

4     may have said they were cell phones.  I don't

5     recall.  He acknowledges that he did in fact

6     give Jose these packages.  Yes.

7          ALJ DUBIAC:  Okay.  The 11.  Were they

8     all in one book.  No.  They were different.

9     Different addresses you said?

10          MR. CLEARY:  11 different parcels.

11          ALJ DUBIAC:  11 different.  I'm sorry?

12          MR. CLEARY:  11 different parcels.  11

13     different cartons.

14          ALJ DUBIAC:  Parcels.  11 different

15     addresses?

16          MR. CLEARY:  Yes.

17          ALJ DUBIAC:  Okay.  Well, would the

18     claimant be able to recognize also that

19     they're cell phones as you indicated that you

20     could tell from the packaging?

21          MR. CLEARY:  Most likely with his uh, I

22     mean he'd been on the job for a couple of

23     years.

24          ALJ DUBIAC:  Okay.

25          MR. CLEARY:  I would venture a guess

Murray - Testimony

1

2          that he could.

3              ALJ DUBIAC:  All right.  Were any

4          criminal charges pressed, filed against the

5          claimant?

6              MR. CLEARY:  Yes.

7              ALJ DUBIAC:  And did the employer file

8          them?

9              MR. CLEARY:  Uh, we signed a claimant.

10         It's a uh…

11             ALJ DUBIAC:  It's okay.  You can answer

12         my question.  And what happened to the uh,

13         was he arrested?

14             MR. CLEARY:  Yes.

15             ALJ DUBIAC:  And what was the outcome?

16             MR. CLEARY:  Uh, the next hearing date

17         in August.

18             ALJ DUBIAC:  Still pending?

19             MR. CLEARY:  Still pending.

20             ALJ DUBIAC:  All right.  All right.

21         There's a statement in the file.  It's

22         appears to be claimant's TCC413.9.  It says

23         the proceedings are sealed and dismissed as

24         of August 23.  Do you disagree with that?

25             MR. CLEARY:  It's not August 23 yet.

Murray - Testimony

     ALJ DUBIAC:  All right.  But are they scheduled to be dismissed do you know?

     MR. CLEARY:  Not that I know of.

     ALJ DUBIAC:  Okay.  It says um also that there's a pending arbitration.  Is that true?

     MR. CLEARY:  Yes.

     ALJ DUBIAC:  Was there any binding arbitration decision?

     MR. CLEARY:  No.

     ALJ DUBIAC:  As far as you know?

     MR. CLEARY:  No.

     ALJ DUBIAC:  Okay.  Just because I've read from this document, I'd like to receive it into evidence.  It's a two page document and it's dated uh June 1, '07.  I'm showing it to the employer's witness.  Any objection or comment to its receipt into evidence?

     MR. MURRAY:  No.  Where does it say on here though…

     ALJ DUBIAC:  The second page.  The last paragraph I think it is.

     MR. CLEARY:  Sealed and dismissed as of 8/23.

     MR. MURRAY:  Okay.

Murray - Testimony

1

2    ALJ DUBIAC:  Any objection or comment to

3    its receipt?

4    MR. MURRAY:  No.

5    ALJ DUBIAC:  I'm showing it to the

6    claimant.  Any objection or comment to its

7    receipt into evidence?

8    MR. MURRAY:  No ma'am.

9    ALJ DUBIAC:  The document is marked

10   exhibit 2.  It's received into evidence.  All

11   right.  Mr. Murray, did you want to ask Mr.

12   Cleary any questions and I'm talking about

13   questions now?  It's not your turn to testify

14   just yet.  Did you want to ask him anything?

15   MR. MURRAY:  No.

16   ALJ DUBIAC:  Okay.  Would you raise your

17   right hand?  Do you swear or affirm to tell

18   the truth?

19   MR. MURRAY:  Yes.

20   ALJ DUBIAC:  Okay.  You can put your

21   hand down.  Just state your name.

22   ALJ DUBIAC:  Keith Murray.

23   ALJ DUBIAC:  You heard the background

24   testimony and I'm only talking to the

25   background now as to the kind of company this

Murray — Testimony

was, your position there, the period of your employment, the last day that you worked. You were full time. You were a union member and you were paid by the hour. Do you agree or disagree with the background testimony?

MR. MURRAY:  Yes.  I agree.

ALJ DUBIAC:  And what were you paid by the hour?

MR. MURRAY:  $16.80.

ALJ DUBIAC:  Did you quit or were you discharged?

MR. MURRAY:  I was forced to resign.

ALJ DUBIAC:  Okay.  And was that on February 2nd '07?

MR. MURRAY:  On the 2nd.

ALJ DUBIAC:  Yeah.  Okay.  And this is your resignation letter or note?

MR. MURRAY:  Yes.

ALJ DUBIAC:  Exhibit 1?  Okay.  And uh did you choose to resign instead of being discharged?

MR. MURRAY:  Uh, well the way it was presented to me, yes, because…

ALJ DUBIAC:  All right.

Murray - Testimony

    MR. MURRAY:  Because he said that if I
didn't resign, then he would fire me for
grand larceny.

    ALJ DUBIAC:  Okay.  And um was it
explained to you why you were going to be
discharged?

    MR. MURRAY:  Um, well, basically…

    ALJ DUBIAC:  Yes or no?  Did he explain
or did anybody explain why you were going to
be discharged?

    MR. MURRAY:  Yes.

    ALJ DUBIAC:  Okay.  Did you participate
in any kind of a scheme to obtain um cell
phones and to deliver fraudulently ordered
cell phones?

    MR. MURRAY:  No.

    ALJ DUBIAC:  All right.  Did you uh
while performing your route, um sometime
between December '06 to the beginning of
February '07, uh did you give uh deliver cell
phones to a person named Jose?

    MR. MURRAY:  Yes.

    ALJ DUBIAC:  All right.  And were these
cell phones that were in packages that were

Murray - Testimony

addressed to different addresses?

    MR. MURRAY:  Um, to the people in the area.  Yes.

    ALJ DUBIAC:  Okay.  And why did you give them to Jose?

    MR. MURRAY:  Well, during the situation that was actually going on, I was being really pressured by management company as in getting the packages off.  I was told by them that I can get to know the supers, get to know the helpers.  Get the packages off and that's all I was doing.

    ALJ DUBIAC:  So who was Jose?

    MR. MURRAY:  Jose was the super helper.

    ALJ DUBIAC:  What do you mean a super helper?  You mean for a building?

    MR. MURRAY:  Yeah.  For buildings (inaudible).

    ALJ DUBIAC:  In that area, upper Manhattan?

    MR. MURRAY:  Yes.

    ALJ DUBIAC:  Okay.  And uh so you were told by your manager?

    MR. MURRAY:  Yeah and my (inaudible)

Murray - Testimony

1

2      supervisor.

3          ALJ DUBIAC:  That you could give uh

4      packages.

5          MR. MURRAY:  Yes.  I can trust these

6      people to get the packages off.  Their main

7      concern was to get the packages off.

8          ALJ DUBIAC:  All right.  Well were these

9      packages all delivered to an address where he

10     was the supers' helper?

11         MR. MURRAY:  Um, to different buildings

12     that he helped in?

13         ALJ DUBIAC:  Yes.

14         MR. MURRAY:  And some of them was his

15     that he ordered in his own name.

16         ALJ DUBIAC:  How do you know that they

17     were addressed to um the building where he

18     worked?

19         MR. MURRAY:  He would have receipts for

20     the customers that request for them to get

21     the packages.  (inaudible) tracking numbers.

22         ALJ DUBIAC:  Did he have receipts?  At

23     all times, at all times that you gave him,

24     first of all, did you recognize the packages

25     of having cell phones in them?

Murray - Testimony

1

2          MR. MURRAY:  Well, no.

3          ALJ DUBIAC:  Okay.

4          MR. MURRAY:  Not knowing that they were

5      all cell phones.

6          ALJ DUBIAC:  All right.  But at all the

7      times that you gave Jose packages, did he

8      have the receipts from customers?

9          MR. MURRAY:  Mm hm.

10         ALJ DUBIAC:  Yes?  You have to speak.

11         MR. MURRAY:  Yes ma'am.  Yes ma'am.

12         ALJ DUBIAC:  Okay.  All right.  Did you

13     feel that you could have been doing anything

14     wrong?

15         MR. MURRAY:  No because I called and

16     spoke to my supervisor early on, say about

17     the beginning of 2006 when he was picking

18     them up from the neighbors after I delivered

19     them.

20         ALJ DUBIAC:  Who was picking them up?

21     Jose?

22         MR. MURRAY:  Jose.

23         ALJ DUBIAC:  Okay.  So you called your

24     supervisor.

25         ALJ DUBIAC:  Mm hm.

Murray - Testimony

1

2       MR. MURRAY:  And explained that to him

3       and he told me that there was nothing that we

4       can do with arrangements that customers make

5       outside of spending their money.  So his main

6       concern was to get the packages off.

7       ALJ DUBIAC:  So he said it was okay to

8       give to Jose?

9       MR. MURRAY:  Yeah.

10      ALJ DUBIAC:  And who was that?  Who was

11      the supervisor?

12      MR. MURRAY:  That was Ralph.

13      ALJ DUBIAC:  Ralph?

14      MR. MURRAY:  Yes.

15      ALJ DUBIAC:  Who's Ralph?

16      MR. MURRAY:  Ralph Carter was my road

17      supervisor.

18      ALJ DUBIAC:  Okay.  And when did he tell

19      you this?

20      MR. MURRAY:  This was like the beginning

21      of me starting that area.  I would say like,

22      it was still cold.  That's…

23      ALJ DUBIAC:  All right.  Now, uh were

24      you arrested on charges?

25      MR. MURRAY:  Yes.

1    Murray - Testimony

2            ALJ DUBIAC:  Okay.

3            MR. MURRAY:  They had me arrested.

4            ALJ DUBIAC:  And what was the result of

5        that?

6            MR. MURRAY:  Um, I'm waiting for it to

7        be dismissed.

8            ALJ DUBIAC:  So they're still pending?

9            MR. MURRAY:  Yeah.  The first court date

10       was May…

11           ALJ DUBIAC:  I don't need to know that.

12       I just need to know is it still pending?

13           MR. MURRAY:  Yes.

14           ALJ DUBIAC:  And you're saying it's

15       scheduled to be dismissed?

16           MR. MURRAY:  August 23rd.

17           ALJ DUBIAC:  What leads you to believe

18       it's going to be dismissed August 23rd?

19           MR. MURRAY:  The notice that they gave

20       me.

21           ALJ DUBIAC:  Who gave you?

22           MR. MURRAY:  Uh, the court telling me I

23       don't have to come back unless they call.

24           ALJ DUBIAC:  Let me see what you have.

25       All right.  Well, it doesn't say that.  It

Murray - Testimony

says if no action is taken by the district

attorney prior to the above date, the

(inaudible) will be dismissed and sealed.

ALJ DUBIAC:  Right.  My legal aid is

telling me that they haven't made any steps

or anything to go forward with the case and

it looks like a good case to be dismissed so…

ALJ DUBIAC:  Okay.  All right.  So

anyway…

MR. MURRAY:  (inaudible).

ALJ DUBIAC:  But it's still pending?

MR. MURRAY:  Yes.

ALJ DUBIAC:  Okay.  All right.  I'd like

to make a copy of this.  Uh, any objection to

it, any objection or comment to its receipt

into evidence?

MR. MURRAY:  No.

ALJ DUBIAC:  All right.  This is uh

criminal court of the state of New York.

It's a note.  It's on a form CRC5034295.

It's a one page document.  I'm showing it to

Mr. Cleary.  Any objection or comment to its

receipt into evidence?

MR. CLEARY:  No ma'am.

Murray - Testimony

1
2          ALJ DUBIAC:  I'll make, you need this.
3      Correct?
4          MR. CLEARY:  Yes.
5          ALJ DUBIAC:  I'll give it back to you.
6      So I'm just going to deem the copy marked as
7      exhibit 3 and it's received into evidence.
8      All right.  Did you have any knowledge that
9      Jose um, that the cell phones that you gave
10     to Jose could have been a part of a um
11     fraudulent uh cell phone uh order or scheme?
12         MR. MURRAY:  No.  No.
13         ALJ DUBIAC:  And you heard Mr. Cleary.
14     He testified that this would be outside the
15     employer's rules or regulations or procedures
16     to give one person um packages that were
17     delivered to other people?  You heard him say
18     that.  Correct?
19         MR. MURRAY:  Yes.
20         ALJ DUBIAC:  And was it outside those
21     procedures?
22         MR. MURRAY:  No.
23         ALJ DUBIAC:  It wasn't?
24         MR. MURRAY:  No.  I don't feel that it
25     was cause I feel I was doing my job due to…

Murray - Testimony

1
2    ALJ DUBIAC:  No.  I just want to know
3    are you familiar with the procedures for
4    delivering packages?
5    MR. MURRAY:  Yes.
6    ALJ DUBIAC:  And you're saying those
7    procedures permit you to give to one person?
8    MR. MURRAY:  Customers come and pick up
9    from the truck.
10    ALJ DUBIAC:  Is the answer yes or no?
11    MR. MURRAY:  Yes.  Yes.
12    ALJ DUBIAC:  Okay.  And you're saying
13    you also had approval from your supervisor?
14    MR. MURRAY:  Yes.
15    ALJ DUBIAC:  Okay.  All right.  Mr.
16    Cleary, any questions of the claimant?
17    MR. CLEARY:  Yes.
18    ALJ DUBIAC:  Questions now.  Put it in
19    the form of a question.  What is it?
20    MR. CLEARY:  Was Jose the super of 508
21    West 190th Street?
22    ALJ DUBIAC:  That's not a question.
23    That's a statement that you're making.  You
24    can say isn't it true that.  You've got to
25    put it in a question form.

Murray - Testimony

MR. CLEARY:  Is it true…

ALJ DUBIAC:  Isn't it true that…

MR. CLEARY:  Isn't it, well, isn't it true that Jose was not the super or the super's helper at 508 West 190th Street?

ALJ DUBIAC:  He already testified that he was so that's repetitive.  Any other questions?

MR. CLEARY:  How many buildings was the Jose the super for or the super's helper for?

MR. MURRAY:  He had a number of different buildings that he helped.

MR. CLEARY:  What buildings?

ALJ DUBIAC:  Do you know how many there were?

MR. MURRAY:  No ma'am.

MR. CLEARY:  Can you recall any of the addresses that he was a super's helper for?

MR. MURRAY:  Um, I believe 5, what was that?  550 on 80th.  On 88th Street I think that was.  The 556, 52.  I think it was 54.  54 and 52.  Those two are the buildings next to him.  He even helped on 18 um 9th Street.  I cannot remember all the building numbers

Murray - Testimony

off hand but he was a helper with different buildings in the area.

ALJ DUBIAC:  Any further questions?

MR. CLEARY:  When you say that he had receipts from customers, can you describe what type of receipt it was?

MR. MURRAY:  Just the receipts from the store.

MR. CLEARY:  From what store?

MR. MURRAY:  I have no idea.  Just a printout.  A  receipt.  A receipt when you go and pay for something.  A receipt.

ALJ DUBIAC:  Any further questions?

MR. CLEARY:  Um, did Ralph Carter ever tell you that it was okay to deliver packages from multiple addresses to one person on the street?

ALJ DUBIAC:  He just testified to that.

MR. MURRAY:  (inaudible).

ALJ DUBIAC:  Wait just a second.  Just a second.  He just testified that Ralph Carter gave him permission to give packages, multiple packages to one person.  Any other questions?

Murray - Testimony

1
2          MR. CLEARY:  No.

3          ALJ DUBIAC:  In order to expedite his

4      deliveries.  Is that correct?

5          MR. MURRAY:  Yes.  Give the packages

6      out.

7          ALJ DUBIAC:  All right.  Any other

8      questions?  Okay.  Then, uh I have nothing

9      further either so we can go to closing

10     argument.  I don't feel it's necessary to

11     observe the video because the claimant

12     essentially has admitted that he did give the

13     packages to Jose so (inaudible) it would only

14     be repetitive to show the video.  So I'm

15     going to dispense with that.  All right.  So

16     we're going to go to closing argument.  Um,

17     before I do that, um I just want to go back

18     to the employer.  Um, the claimant testified

19     that he was given permission by Ralph Carter,

20     a supervisor, um to give the packages to

21     Jose.  Did he ever indicate that to you or to

22     anybody at the employer's office?

23         MR. CLEARY:  Did he indicate that to us?

24         ALJ DUBIAC:  Yes.

25         MR. CLEARY:  He mentioned Ralph's name.

Murray - Testimony

ALJ DUBIAC:  All right.  Did you ever talk to Ralph to see if this was true?

MR. CLEARY:  Yes.

ALJ DUBIAC:  What did he say?

MR. CLEARY:  He said that he didn't uh say that he could uh deliver multiple addresses to one guy in the street.

ALJ DUBIAC:  What did he say?

MR. CLEARY:  He said he can leave packages with supers for specific buildings and he can deliver packages to customers in the street who come up with i.d. matching the cartons but he can't deliver multiple addresses to supers in the street.

ALJ DUBIAC:  Okay.  But that would have been in violation of the employer's policies. Correct?

MR. CLEARY:  Correct.

ALJ DUBIAC:  Okay.  All right.  In other words, the advice that he gave to the claimant.  That was in violation of the employer's policies.  Right?

MR. CLEARY:  If…

ALJ DUBIAC:  Delivering to customers in

Murray - Testimony

the street.  Correct?

MR. CLEARY:  Cause that's what he said.
Yes.

ALJ DUBIAC:  Okay.  Well, is that what he said to you?  Whatever he said to you, was that, any of that in violation of the employer's policies?

MR. CLEARY:  What he said to me was not in violation of our policy.  No.  What he said to me…

ALJ DUBIAC:  I thought you said that…

MR. CLEARY:  What he said to me did not match up with what Mr. Murray said.

ALJ DUBIAC:  That's not what I'm asking you.

MR. CLEARY:  Okay.

ALJ DUBIAC:  Anything that Mr. Carter told you that he advised the claimant to do, was any of it in violation of the employer's policies?

MR. MURRAY:  No.

ALJ DUBIAC:  I thought you said that you can't deliver something to someone in the street.

Murray - Testimony

      MR. CLEARY:  If a customer approaches the delivery vehicle…

      ALJ DUBIAC:  Mm hm.

      MR. CLEARY:  Looking for their own package…

      ALJ DUBIAC:  Right.

      MR. CLEARY:  And they have identification that matches the package…

      ALJ DUBIAC:  Mm hm.

      MR. CLEARY:  It's okay to deliver.

      ALJ DUBIAC:  Okay.  All right.  Mr. um Murray, any questions of Mr. Cleary?

      MR. MURRAY:  No ma'am.

      ALJ DUBIAC:  Okay.  Then we're going to closing arguments.  I'm going to let um Mr. uh Murray go first.  Do you wish to make a closing argument?

      MR. MURRAY:  Pertaining?

      ALJ DUBIAC:  Why you feel you should win this hearing.

      MR. MURRAY:  Well because I was, because I was arrested.  I was falsely accused.  I spent 7 days in jail for something that I did not have no parts of or no knowledge of and I

Murray - Testimony

was released.  There was no bail, no nothing.

I haven't been called back down for this

criminal case or anything and I feel I should

have my unemployment until we go back to um…

ALJ DUBIAC:  Criminal court?

MR. MURRAY:  No.  Not criminal court.

ALJ DUBIAC:  Arbitration?

MR. MURRAY:  Yes.  Arbitration.  That's

the word I was looking for because um I was

falsely, my job was falsely taken away.

ALJ DUBIAC:  Okay.  Mr. Cleary, any

questions of the claimant?

MR. CLEARY:  No.

ALJ DUBIAC:  Do you wish to make a

closing argument Mr. Cleary?

MR. CLEARY:  Yes.

ALJ DUBIAC:  Go ahead.

MR. CLEARY:  Mr. Murray was discharged

due to his uh involvement in a scheme to

obtain fraudulently ordered phones.  We

confirm that the phones were fraudulently

ordered by contacting Sprint security.  The

methods that he used to deliver the phones

bypassed standard UPS procedures.

1    Murray - Testimony

2         Confirmation with on road supervisor who

3         trained and supervised Mr. Murray determined

4         that he was not given authorization to

5         deliver the packages as such.  Mr. Murray

6         along with two other individuals were

7         arrested that day by the Manhattan...

8              ALJ DUBIAC:  Well, that's new testimony.

9         There was no prior testimony...

10             MR. CLEARY:  Okay.

11             ALJ DUBIAC:  About two other individuals

12        being arrested.  Just stick to the testimony.

13        Make your argument based on the testimony

14        that's been presented.  Anything further?

15             MR. CLEARY:  That's pretty much it then.

16             ALJ DUBIAC:  I'm sorry?

17             MR. CLEARY:  That's pretty much it then.

18             ALJ DUBIAC:  Okay.  All right.  Any

19        other questions of Mr. Cleary?

20             MR. MURRAY:  No ma'am.

21             ALJ DUBIAC:  All right.  Then everybody

22        can leave.  The hearing is closed.  Have a

23        good day.  I'm going to meet the claimant in

24        the reception room to give you back your

25        document after I copy it.

1      Murray — Testimony

2                  MR. MURRAY:  Okay.

3                  ALJ DUBIAC:  Going off the record.

4

5                              *  *  *  *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3                              * * * * * * * *

4    This is to certify that I have typed the above

5    record from a cassette (s) produced from an

6    electronic sound recording system in the State of

7    New York and that to my best knowledge and belief

8    the above record was typed by me is a true and

9    accurate record of the audiotape contents of the

10   cassette (s).

11

12

13

14   Cinzia Lister

15   THE MECHANICAL SECRETARY, INC.
     108-16 72nd Avenue
16   Forest Hills, New York  11375

17

     Date cassette was transcribed:
18
     August 31, 2007
19
20
21
22
23
24
25

# EXHIBIT F



**STATE OF NEW YORK**
# UNEMPLOYMENT INSURANCE APPEAL BOARD
### ADMINISTRATIVE LAW JUDGE SECTION
P O BOX 697
NEW YORK NY 10014-0697
(212) 352-6982

**MARGARET O'BRIEN**
CHIEF ADMINISTRATIVE LAW JUDGE

LAURANCE I PAVER
LEONARD R SHAPIRO
HOWARD M MEISELES
ALTERIO A COLETTI
SENIOR ADMINISTRATIVE LAW JUDGE

PRINCIPAL ADMINISTRATIVE LAW JUDGE

### DECISION AND NOTICE OF DECISION
### DECISIÓN Y AVISO DE LA DECISIÓN TOMADA

---

A L J Case No 007-13959

IN THE MATTER OF

Mailed and Filed

**JUL 3 0 2007**

KEITH L MURRAY
2116 CROTONA PKWY   #3D
BRONX NY 10460

UNITED PACEL SERVICE INC
180 CANAL ST
BRONX NY 10451

TALX UCEXPRES
PO BOX 283
ST LOUIS MO 63166-0283

Department of Labor Office  801

Hearing Requested  July 02, 2007

**PLEASE TAKE NOTICE** that this decision has been duly mailed on the date listed above  If you appeared at the hearing and are not satisfied with this decision, you may appeal within **TWENTY DAYS** from the date this decision was mailed  Any party who failed to appear at the hearing has the right to apply to reopen the case  For the application to be granted, the party must apply within a reasonable time and must establish good cause for its failure to appear  **READ IMPORTANT INFORMATION ON REVERSE SIDE.**

**POR FAVOR TOME NOTA** que esta decisión ha sido debidamente enviada por correo en la fecha que aparece arriba  Si usted asistió a la audiencia y no está satisfecho con la decisión, usted puede apelar dentro de los **VEINTE DIAS** a partir de la fecha en que esta decisión fué enviada por correo  Cualquiera de las partes que falte en comparecer a la audiencia, tiene derecho de aplicar para que reabran su caso  Para que la apelación sea aceptada, la parte interesada debe aplicar dentro de un período de tiempo razonable y debe establecer buena causa por no haber comparecido a la audiencia  **LEA INFORMACIÓN IMPORTANTE AL REVERSO.**

**DOCUMENTO IMPORTANTE  PUEDE OBTENER UNA TRADUCCIÓN DEL MISMO LLAMANDO AL 1-888-209-8124 (FUERA DEL ESTADO DE NUEVA YORK 1-877-358-5306)**

ISSUES        Loss of employment through misconduct
              Employer's objection to claimant's entitlement

The Department of Labor issued the initial determination holding the claimant eligible to receive benefits
The employer requested a hearing and objected contending that the claimant should be disqualified from receiving benefits on the basis that the claimant lost employment through misconduct in connection with that employment and holding that the wages paid to the claimant by the employer cannot be used toward the establishment of a claim for benefits

AB 665-0 (10/06)

CONFIDENTIAL
UPS 000661

## NOTICE OF DECISION

### CLAIMANTS

### IF YOU DISAGREE WITH THIS DECISION, YOU HAVE A RIGHT TO APPEAL TO THE UNEMPLOYMENT INSURANCE APPEAL BOARD

Parties may be represented by lawyers or other persons of their choice on appeal to the Appeal Board  For representing a claimant, a lawyer or an agent registered by the Appeal Board may charge a fee  The fee must be approved by the Appeal Board before payment may be accepted by such lawyer or agent  No other person may charge a fee for representing a claimant  If you do not have enough money to hire a lawyer or registered agent, you may be able to get one free through your local Legal Aid Society or Legal Services Program

### TO APPEAL A DECISION

1    Continue to follow all instructions from the Unemployment Insurance office where you originally filed your claim and to certify for benefits as long as you are unemployed and claiming benefits  This will protect your rights to any benefits you claim

2.   Within twenty (20) days of the date printed on the face of this decision, mail a letter to the office where you originally filed your claim or to the Appeal Board at P O  Box 15126, Albany, New York  12212-5126, or fax your appeal to the Appeal Board at (518) 402-6208  Please state that you wish to appeal and the reasons for your appeal  Include your ALJ Case Number (found just above your name on the face of the Notice of Decision) and a copy of the Notice of Decision

3    Claimants who appeal are **not** required to pay a deposit on filing an appeal

### EMPLOYERS

If you wish to appeal this decision, you may file a notice of appeal within twenty (20) days from the date printed on the face of this decision to the office where the claim was originally filed and which issued the initial determination, or to the Unemployment Insurance Appeal Board at P O  Box 15126, Albany, New York  12212-5126, or you may fax your notice of appeal to the Appeal Board at (518) 402-6208  Such notice of appeal should include the A L J  Case Number (found on the face of this Notice of Decision), the reason(s) for the appeal and a copy of the Notice of Decision

### ALL PARTIES WILL RECEIVE A NOTICE OF RECEIPT OF APPEAL DIRECTLY FROM THE APPEAL BOARD AFTER ANY APPEAL IS MADE.

## INSTRUCCIONES A LOS RECLAMANTES

### RECLAMANTES

### SI NO ESTÁ DE ACUERDO CON ESTA DECISIÓN, USTED TIENE DERECHO DE APELARLA A LA JUNTA DE APELACIONES DEL SEGURO POR DESEMPLEO.

Las partes si lo desean, pueden estar representadas por abogados u otras personas que ellos seleccionen en la apelación a la Junta de Apelaciones (Appeal Board).  Un abogado o un agente que esté registrado por la Junta de Apelaciones, puede cobrarle honorarios por representarle  Estos honorarios deben ser aprobados por la Junta de Apelaciones antes que el pago pueda ser aceptado por dicho abogado o agente registrado.  Ninguna otra persona podrá cobrar honorarios por representar al reclamante.  Si usted no tiene suficiente dinero para contratar a un abogado o un agente registrado, puede conseguir uno gratis a través de la Sociedad de Asistencia Legal  (Legal Aid Society) o el Programa de Servicios Legales (Legal Services Program)

### PARA APELAR LA DECISIÓN

1.   Continúe siguiendo todas las instrucciones de la oficina del Seguro por Desempleo (Unemployment Insurance) donde usted presentó su reclamo originalmente y para certificar por los beneficios mientras permanezca desempleado y esté reclamando beneficios  Esto protegerá su derecho a recibir cualquier beneficio que reclame.

2.   Antes de cumplirse veinte (20) días de la fecha que aparece al frente de esta decisión, envíe una carta a la oficina donde presentó originalmente su petición o al Appeal Board a P O  Box 15126, Albany, New York  12212-5126, o envíe por fax su apelación al Appeal Board al (518) 402-6208  Por favor, explique que desea apelar y las razones que tiene para hacerlo.  Incluya su número de caso ALJ (lo encontrará justo encima de su nombre al frente de este Aviso de Decisión) y envíe una copia de este Aviso de Decisión.

3.   Los reclamantes **no** necesitan depositar dinero para poder apelar su caso

### TODAS LAS PARTES RECIBIRÁN UN AVISO DE RECIBO DE APELACIÓN DIRECTAMENTE DE LA JUNTA DE APELACIONES DESPUÉS DE QUE SU PETICIÓN SEA RECIBIDA.

AB 665 (03-01)

CONFIDENTIAL
UPS 000662

A L J  Case No 007-13959          KEITH L MURRAY                              Page 2

A hearing was held at which testimony was taken  There were appearances by the claimant and on behalf of the employer

FINDINGS OF FACT  Claimant was employed as a delivery driver for a transportation company for approximately two years until February 2, 2007  Because the employer believed that claimant participated in a scheme to obtain and deliver fraudulently ordered cell phones, he was discharged from his employment on that date  Claimant did not commit such acts  Criminal charges against claimant are pending

OPINION  Pursuant to Labor Law § 593 (3), a claimant is disqualified from receiving benefits after having lost employment through misconduct in connection with that employment  Pursuant to Labor Law § 527, the wages paid in such employment cannot be used to establish a future claim for benefits

The credible evidence establishes that claimant was discharged because the employer believed that he participated in a scheme to obtain and deliver fraudulently ordered cell phones  As claimant did not commit such acts, on the record before me, I find that he committed no act of misconduct that resulted in his discharge  In reaching this decision, I do not find the employer's testimony that claimant violated the employer's delivery procedures to be significant as there was no testimony that claimant was discharged for such reason alone  Accordingly, I conclude that claimant is not subject to any disqualification and he is entitled to receive benefits

DECISION  The employer's objection is overruled

The initial determination is sustained

The claimant is allowed benefits with respect to the issues decided herein

/s/ Diane Dubiac

**Administrative Law Judge**

CONFIDENTIAL
UPS 000663

# EXHIBIT G

Richard J. Rabin (RR-0037)
Evandro C. Gigante (EG-7402)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022
(212) 872-1000
rrabin@akingump.com
egigante@akingump.com

*Attorneys for Defendant United Parcel Service, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

KEITH MURRAY,

                            Plaintiff,

                  -against-

UNITED PARCEL SERVICE OF AMERICA, INC.,
UNITED PARCEL SERVICE, INC., AND UNITED
PARCEL SERVICE CO.,

                         Defendants.

------------------------------------------------------------- x
------------------------------------------------------------- x

UNITED PARCEL SERVICE, INC.,

                Third-Party Plaintiff,

          -against-

JOSE BEATO,

                Third-Party Defendant.

------------------------------------------------------------- x

NO. 08-CV-02160 (LAK)

**DEFENDANT'S SECOND SET
OF DOCUMENT REQUESTS TO
PLAINTIFF**

       Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Rules

of the United States District Court for the Southern District of New York, Defendant/Counter-

1

Plaintiff United Parcel Service, Inc. ("UPS"), by and through its attorneys Akin Gump Strauss

Hauer & Feld LLP, request that Plaintiff Keith Murray ("Plaintiff" or "Murray") produce and

permit UPS to inspect and copy the documents described below at Akin Gump Strauss Hauer &

Feld LLP, 590 Madison Avenue, 20th Floor, New York, New York, 10022, within thirty (30)

days from the date of service hereof.

DEFINITIONS

1.    "Person" shall be deemed to include both the singular and the plural and means

any natural persons, corporations, partnerships, organizations, associations, or legal or

governmental entities or associations.

2.    "Complaint" means or refers to the First Amended Complaint filed in the above-

captioned action by Plaintiff Keith Murray.

3.    "Plaintiff" and "Murray," as well as the Plaintiff's full or abbreviated name and a

pronoun referring to the Plaintiff, mean or refer to Keith Murray, including his agents, servants,

employees, attorneys, accountants, and any other persons acting or purporting to act on his

behalf.

4.    "Defendant," or "UPS" as well as the Defendant's full or abbreviated names and

pronouns referring to the Defendant, mean or refer to United Parcel Service, Inc., including their

respective officers, directors, agents, servants, employees, attorneys, accountants, corporate

parents, subsidiaries, affiliates, divisions, predecessors and successors, and any other persons

acting or purporting to act on their behalf.

5.    "Third-Party Defendant or "Beato," as well as the Third-Party Defendant's full or

abbreviated name and a pronoun referring to the Third-Party Defendant, mean or refer to Jose

2

Beato, including his agents, servants, employees, attorneys, accountants, and any other persons acting or purporting to act on his behalf.

6.      "Hipolito Garcia" or "Garcia", as well as Garcia's full or abbreviated name, mean or refer to Hipolito Garcia, including his agents, servants, employees, attorneys, accountants, and any other persons acting or purporting to act on his behalf.

7.      The phrase "possession, custody, or control" means actual or constructive possession, custody, or control.  Any document which is not in a person's immediate physical possession, but which the person has a right to compel a third person to produce, or which is otherwise subject to the control of the person in question, is within that person's "possession, custody, or control," including, for example, any document located or kept in that person's office, residence or vacation home, in any other place that person has access, or in the possession of that person's agents, accountants, attorneys, or representatives of any kind.

8.      The term "communication" shall be construed to mean the transmittal of information (in the form of facts, ideas, data transmission, inquiries or otherwise), including, but is not limited to, any conversations, meetings, discussions, or other forms of verbal exchange, whether in person or by telephone, and any documents, writings, or correspondence.

9.      The term "document" shall be synonymous in meaning and equal in the scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, but not limited to, all original, non-identical copies and drafts of correspondence, communications, letters, papers, contracts, invoices, purchase orders, agreements, records, reports, books, summaries of records of communications, diaries, notes, messages, facsimiles, memoranda, minutes, graphs, spreadsheets, diagrams, valuations, appraisals, tape recordings, and computer data. The term "document" shall further include, without limitation, any electronically stored information,

3

electronic and magnetically stored forms of data in any format or file type, including electronic

mail. Each non-identical copy of a document is a separate document to be produced. Each

document that is attached by staple, clip or otherwise to a document requested herein, or referred

to as an exhibit, appendix, schedule, amendment, rider or supplement to a requested document,

shall also be produced (attached in the same manner as the original) regardless of whether the

production of that document is otherwise requested herein. Each request herein for documents to

be produced requires production of the documents in their entirety without abbreviation or

expurgation.

   10. The term "relating to" means relating to, concerning, regarding, referring to,

describing, evidencing, or constituting.

   11. The term "all" means each and all.

   12. The term "any" means any and all.

   13. The term "each" means each and all.

   14. The terms "between" and "among" shall be construed as between or among.

   15. The connectives "and" and "or" shall be construed either disjunctively or

conjunctively as necessary to bring within the scope of the discovery request all responses that

might otherwise be construed to be outside of its scope.

   16. The use of the singular form of any word includes the plural and vice versa.

INSTRUCTIONS

   1. Plaintiff is requested to produce all documents described below, wherever located,

that are in his possession, custody or control, or in the possession, custody or control of any of

his agents, servants, employees, attorneys, accountants, or other persons acting or purporting to

act on his behalf, at the offices of Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue,

4

20th Floor, New York, New York, 10022, within thirty (30) days from the date of service hereon. The inspection and copying of the documents will continue from day to day until completed.

2.    Documents shall be produced in an order corresponding to each paragraph of this document request, or, in the alternative, they may be produced in the same order in which they are maintained in the ordinary course of business.

3.    The time period covered in this document request begins on January 1, 2006, and carries through to the date of production of the requested documents set forth in paragraph 1 of these Instructions, unless otherwise specifically indicated. This is a continuing request. Any document created, obtained or located after the date of production that would have been produced had it been available or had its existence been known at or prior to that time should be produced immediately.

4.    Any copy of a document that varies in any way from the original or from any other copy of the document, whether by reason of handwritten or other notation or any omission, constitutes a separate document and must be produced, whether or not the original of such a document is within Plaintiff's possession, custody or control.

5.    If Plaintiff refuses to produce any requested document under a claim of attorney-client privilege, work product privilege, or any other privilege, Plaintiff is requested to submit for each document withheld a written statement that identifies: (a) the privilege or other asserted basis for withholding the document; (b) the nature and general topic of the document; (c) the person who prepared the document and any persons to whom the document was sent or disclosed; (d) any person who has seen or had possession of the document; and (e) the dates on which the document was prepared, transmitted and received.

5

6.      If any document requested herein was formerly in the possession, custody, or control of Plaintiff and has been lost or destroyed, Plaintiff is requested to submit a written statement that identifies: (a) the nature of the document and its contents; (b) the person who prepared the document and any person to whom the document was sent or disclosed; (c) any person who has seen or had possession of the document; (d) the dates on which the document was prepared, transmitted and received; (e) the dates on which the document was lost or destroyed and, if destroyed, the conditions of and reasons for such destruction and the persons requesting and performing the destruction; and (f) any person with knowledge of the contents or any portion of the contents of the document.

## DOCUMENT REQUESTS

1.      All telephone records (including telephone bills) from Plaintiff's home telephone for all residences at which Plaintiff has resided since January 1, 2006 to the present, including but not limited to his residence at 2116 Crotona Parkway, Bronx, New York 10460.

2.      All telephone records (including telephone bills) for all cellular phones Plaintiff has owned, used or maintained since January 1, 2006 to the present.

3.      All documents relating to any correspondence or communications between Plaintiff and Jose Beato, including but not limited to telephone records, cellular phone records, text messages, electronic communications (including e-mail and instant messages), diaries, notes, as well as all other forms of written and/or electronic communication.

4.      All documents relating to any correspondence or communications between Plaintiff and Hipolito Garcia, including but not limited to telephone records, cellular phone records, text messages, electronic communications (including e-mail and instant messages), diaries, notes, as well as all other forms of written and/or electronic communication.

6

5.      All documents relating to Plaintiff's personal and business contacts, including but not limited to all phone books, address books, telephone contacts, as well as phone numbers and contact information stored in Plaintiff's cellular telephone, computer and other electronic devices.

6.      All documents relating to any correspondence or communication between Plaintiff and Sprint/Nextel, including but not limited to telephone records, home or cellular phone records, electronic communications, diaries, notes, as well as all other forms of written and/or electronic communication.

7.      All documents relating to any correspondence or communication between Plaintiff and Asurion Corp., including but not limited to telephone records, home or cellular phone records, electronic communications, diaries, notes, as well as all other forms of written and/or electronic communication.

Dated:  New York, New York
        July 18, 2008

AKIN GUMP STRAUSS HAUER & FELD LLP

By:    _____
       Richard J. Rabin (RR-0037)
       Evandro C. Gigante (EG-7402)
       AKIN GUMP STRAUSS HAUER & FELD LLP
       590 Madison Avenue
       New York, New York 10022
       (212) 872-1000
       rrabin@akingump.com
       egigante@akingump.com

       *Attorneys for Defendant United Parcel Service, Inc.*

7